**Supreme Court**

No. 2011-364-C.A.
(P1/90-250A)
(P1/90-248A)
(P1/90-247A)
(P1/90-246A)
(P1/89-1667A)
(P1/89-941A)
(P1/87-2828A)
(P1/87-482A)

State                          :

      v.                       :

Robert Raso.                   :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2011-364-C.A.
(P1/90-250A)
(P1/90-248A)
(P1/90-247A)
(P1/90-246A)
(P1/89-1667A)
(P1/89-941A)
(P1/87-2828A)
(P1/87-482A)

State                    :

v.                   :

Robert Raso.          :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** The defendant, Robert Raso, appeals from eight Superior Court judgments of conviction declaring him to be in violation of the terms of his probation and sentencing him to serve twenty-five years of previously imposed suspended sentences. On appeal, the defendant argues that the complaining witness's testimony was inconsistent and not credible, and that, therefore, the hearing justice acted arbitrarily and capriciously in finding a violation. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**I**

**Facts and Procedural History**

In 1990, defendant pled nolo contendere to twenty-six offenses, including: felony assault, second-degree sexual assault, kidnapping, assault with intent to commit murder, arson, and a number of robberies. On the one arson and eight robbery charges, he was sentenced to forty

- 1 -

years at the Adult Correctional Institutions (ACI), consisting of twelve years to serve and twenty-eight years suspended, with probation.

On March 8, 2011, the state filed a probation-violation report pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure[1] alleging that defendant had failed to comply with a specific term of his probation by failing to keep the peace and be of good behavior.[2] In its violation report, the state noted that "[s]aid violation of probation is not contingent upon any specific criminal offense." It was, however, based upon allegations of sexual assault;[3] the complaining witness was defendant's fourteen-year-old stepdaughter, Natalie.[4]

A combined probation violation and bail hearing was conducted over the course of five days in the Superior Court, commencing on March 22, 2011. Thirteen witnesses testified during the hearing regarding Natalie's allegations of sexual abuse, the most recent of which had occurred on March 6, 2011. As the sole issue raised by defendant on appeal concerns the credibility assessments of the hearing justice, we set forth the testimony of the various witnesses in some detail.

---

[1] Rule 32(f) of the Superior Court Rules of Criminal Procedure provides as follows:
> "The court shall not revoke probation or revoke a suspension of sentence or impose a sentence previously deferred except after a hearing at which the defendant shall be afforded the opportunity to be present and apprised of the grounds on which such action is proposed. The defendant may be admitted to bail pending such hearing. Prior to the hearing the State shall furnish the defendant and the court with a written statement specifying the grounds upon which action is sought under this subdivision."

[2] The probation-violation report was filed with respect to only the arson and eight robbery convictions.

[3] A criminal complaint was filed charging defendant with one count of first-degree sexual assault. On September 20, 2011, the first-degree sexual assault case was dismissed under Rule 48(a) of the Superior Court Rules of Criminal Procedure.

[4] Because the complaining witness is a minor child, we identify her pseudonymously.

**The Neighbor**

The defendant's next-door neighbor, Felicia Barbato, testified that she called the Department of Children, Youth and Families (DCYF) on several occasions regarding incidents "that [she] heard inside [her neighbor's] house that [were] disturbing enough to provoke [her] to call DCYF." Barbato testified that she reported hearing Natalie "screaming, begging him to stop, go away, stop touching me." The last call Barbato made to DCYF was on the morning of March 6, 2011, when she reported that she heard Natalie crying and yelling. During her testimony, Barbato indicated that she is on probation herself for several offenses, including forgery and larceny, and that she and defendant did not get along.

**The Complaining Witness**

The complaining witness, Natalie, testified that on the night of March 5, 2011, she went to bed around 10 or 10:30 and then texted defendant to ask him to bring her a milkshake, which he did. She further testified that she woke around midnight or 12:30 on March 6 to find that defendant had entered her room and climbed into bed with her. Natalie stated that defendant removed her pajama bottoms and touched her chest and her vagina with his hands and his mouth. She recalled that defendant had first touched her chest and "made out" with her when she was "nine or ten" and that the sexual conduct, including contact[5] with his penis, occurred on "more than ten" occasions prior to March 6.[6]

---

[5] Natalie testified that she had oral contact with defendant's penis; and stated that, while she did not deny telling the Child Protective Investigator that defendant had penetrated her with his penis, she did not remember what she told the investigator.

[6] During Natalie's testimony, the hearing justice granted a short recess and, before resuming testimony, stated the following:

> "I think it's important that the record reflect, as it certainly can't when it doesn't reflect with words, the difficulty with which this witness had prior to the recess in giving her testimony. There were long pauses between the answers and, in addition, she was

Natalie testified that she had previously told her two best friends, Riley and Sarah, that defendant had molested her, and that, after he left her room that night, she texted them the message "I can't do this anymore."[7] Natalie recalled going out to breakfast with her mother, her sister, and defendant the next morning, where she received text messages from both Riley and Sarah, urging her to get help and tell someone. She recalled crying while reading these messages. Natalie testified that she did not tell her mother then because "she wouldn't believe me and I didn't want all this to happen." After breakfast, the family stopped to buy paint before returning to their home. Shortly after they returned, a DCYF caseworker, Ann Murphy, arrived at the apartment and questioned Natalie. This interview resulted in defendant being removed from the home.

Natalie testified that on the evening of March 10, she was brought to the basement of her mother's friend's home and questioned there for about three and a half hours by her uncle, Ian Sateikis, her mother's friend Heather Burlingame, and, finally, her mother.[8] Throughout a more than three-hour barrage of questions and accusations that she was lying, during which her mother told her that she was "a f * * * ing liar" and that defendant would "die in jail," Natalie maintained that her stepfather had molested her. Natalie recalled that Burlingame told her that

_____

extremely tearful and shaking and was presenting this testimony in the largest courtroom in the building in front of an unusually large audience. Certainly their right to be here, I'm not suggesting otherwise, but I do feel that based on what I observed prior to the recess and part of the reason I took the recess as requested is that this witness, albeit 14 years old, does not present as someone who, of that age, who may be able to handle everything that comes their way and appeared to me to be suffering unreasonable and unnecessary emotional harm in giving this testimony and I just want the record to be clear."

[7] No text messages were entered into evidence, and there was testimony that the text messages had been deleted.

[8] Burlingame, at whose residence these events took place, did not testify.

- 4 -

Natalie herself could be prosecuted. Eventually, however, Natalie told her mother "it wasn't true." She testified that she did so because her mother did not believe her, and that once she recanted, the questioning stopped. The following day, March 11, Natalie gave a statement to the Burrillville police in which she again stated that "it wasn't true." Natalie testified that she did so "[b]ecause [she] wanted it to be over."

### The Young Friends

Natalie's friend Riley testified that in September 2010, Natalie divulged that "her stepfather had been raping her since she was in [s]ixth [g]rade." Riley testified that Natalie did not tell her any details and that "[she] didn't want to know." Riley testified that she never told anyone about this because Natalie asked her to promise not to tell anyone.

The next witness was Sarah, who testified that she was in the seventh grade when Natalie first told her that defendant was molesting her and that he had been doing so since she was nine years old. Sarah recalled that Natalie made her promise to keep it a secret, so that her younger sister would not "get taken away" or "go through life without her father." Sarah stated that she kept this promise and did not tell anyone. Sarah testified that on March 6, Natalie texted her that defendant "drugged her, put duct tape over her mouth and raped her." According to Sarah, the text was deleted when the battery fell out of her phone. Natalie denied ever texting Sarah that defendant drugged her and duct-taped her mouth.

### The Uncle

Ian Sateikis, Natalie's uncle, was the next witness to testify. Sateikis lives in Illinois, and his sister, Penelope Edwards, is married to defendant. Sateikis testified that, after his sister called and told him that Natalie "had made allegations towards [defendant]," he drove to Rhode

Island.  Sateikis recalled that his sister asked him to talk to Natalie "to find out what was going on and if she was telling the truth."

On the evening of March 10, according to Sateikis, he took Natalie, along with Burlingame, to the laundry room in Burlingame's house.  He testified that  Edwards gave him a digital recorder, and, rather than place it on the table in front of Natalie, he put it in his sweatshirt pocket and, half an hour into the questioning, he pressed the record button while the recorder was still in his pocket.[9]

After the initial two hours of questioning Natalie, Sateikis testified, he returned upstairs to speak to Edwards, telling her, "I don't think we're going to get anything."  Upon returning to the basement, Edwards began to question Natalie for "45 minutes, half an hour," according to Sateikis, while he and Burlingame remained in the room with them.  Sateikis characterized the tone of "that 45 minutes" as "[s]ort of like an interrogation style," and he testified that Natalie's demeanor was silent at first, but that she started "getting more frustrated," "more upset" and that she was crying and her voice was "shaky."  He testified that, at some point, Edwards's friends Jessica Lohrke and Jennifer Desper came into the room, but that some of that session was not recorded.  Sateikis testified that he left the room for a period of time and that, when he returned, Edwards wanted to speak to Natalie alone, so he left, along with Burlingame, Lohrke, and Desper.  He testified that twenty to thirty minutes later, Edwards came out with her arm around Natalie saying, "[Natalie] told the truth, that she lied."

Sateikis further testified that on March 15 he went to the Burrillville Police Department to make a statement and that, after meeting with Sergeant Riendeau, he "kind of looked back at the conversation [he] had with [Natalie] that Thursday and [he didn't] think [he] did the right

---

[9] The CD of this recording was admitted into evidence as joint exhibit No. 1.

thing." He recalled being "angry at [him]self," and he testified that he did not think he "really knew fully what was going on at first and [he] shouldn't have talked to her like that." After leaving the police station, Sateikis testified, he spoke to Natalie and apologized, saying, "I shouldn't have done that and I should have listened to her and I asked her if what she had said happened to her happened." Sateikis testified that Natalie said "yes," and told him that she recanted because "she thought it would be over faster and her mom wouldn't believe her anyway." Sateikis then called Sgt. Riendeau and returned to the police station to make another statement.

## The Probation Officer

The defendant's probation officer, Kerri Giorgio, testified that defendant had been on unsupervised probation, but that on January 19, 2011, due to information brought to her attention, his status was changed to supervised probation. In accordance with that change in status, defendant met with Giorgio in her office on February 28, 2011. During this meeting, defendant showed Giorgio some pictures of his family; and when she commented about a resemblance between Natalie and her mother, defendant responded, "oh, yeah, she really started developing there." Giorgio testified that the comment was "a little upsetting" to her and that she made a note of it and brought it up to her supervisor.

## The Child Protective Investigator

Ann Murphy, Child Protective Investigator (CPI) for DCYF, testified that on March 6, 2011, she received a call through the child-abuse hotline concerning Natalie's household. In familiarizing herself with DCYF records, Murphy noted that there had been two other calls to the hotline regarding the residence: one in January and one on March 1, 2011. According to Murphy, no investigator was dispatched in response to either of the earlier calls. Murphy

testified that she contacted Burrillville police and arranged to have an officer meet her at defendant's home.

Murphy testified that she arrived at the home in the early afternoon and, after identifying herself as a CPI, asked to speak with the children. She first spoke with Natalie's four-year-old sister, Katy[10] and, after she satisfied herself with regard to Katy, Murphy interviewed Natalie. After conversing briefly, Murphy stated that she told Natalie that she was there because there were concerns that Natalie was being abused by defendant. According to Murphy, Natalie began crying "very hard," and, in answer to direct questions, affirmed that her stepfather, defendant, had touched her without her consent and that the last time this had occurred was the previous night. Murphy testified that, in response to further direct questions, Natalie stated that defendant put his penis in her mouth, penetrated her vagina, and put his mouth to her vagina. Murphy further testified that Natalie stated that the sexual contact had been going on for four years, since she was nine years old, and that it happened "about once a week over four years." Murphy explained that, as a CPI, her purpose was to find out if abuse had taken place and, if so, to protect the child; she did not attempt to gather full details during an initial interview, leaving that task to Day One.[11]

Murphy testified that the interview with Day One was scheduled to take place on March 11, 2011. Murphy testified that she "made it clear to [Edwards] at that time we expected her to protect her child, not speak with her about the case" because "the child was clearly very upset

---

[10] Again, a pseudonym.

[11] According to Murphy,

> "Day One is a center in Rhode Island that is used for rape victims, for any children who had been sexually abused * * * they do interviews with the police, with the Attorney General's office and with DCYF to ask children questions so they only have to ask the detail one time with everyone present as opposed to being asked over and over and over again."

and needed to be spoken to in a place where the counselor is there, the professionals[] that could process what had taken place."

Murphy testified that she informed the Burrillville police officer that Natalie had disclosed sexual abuse, and the officer removed defendant from the home. According to Murphy, she then sat down to speak with Edwards and told her what Natalie had said happened. Murphy testified that Edwards's immediate response was that "she wanted to be sure it was true, for [Natalie] and [defendant] did not get along." According to Murphy, Natalie was then taken to the hospital for an examination, and a rape kit was performed.

According to Murphy, the following day, after police had removed the sheets from Natalie's room, Edwards called Murphy to tell her that, if there was hair found in the sheets, it could be from defendant, because he slept there Friday night. Murphy testified that Edwards also mentioned that she had taken away Natalie's cellphone. Murphy testified that she told Edwards that, while it was appropriate to monitor telephone, texting, and Facebook, she should give Natalie the phone back because taking it away could be viewed as punishment of the child for disclosing abuse. The next day, March 8, according to Murphy, Edwards stated that, if sperm were found in the sheets, it could be because defendant had "done something with himself on the bed."

Murphy testified that Natalie lived in the house until March 16, when she (Murphy) met with Natalie again about concerns that her mother was not protecting her.

> "She stated that she did not want to live with her mother, that over the past since I had met with her that her mom has asked her several times what had happened, that her mom told her she was lying, that her sister [Katy] wouldn't have a father because of what she has said. She stated that her phone had been taken away and

- 9 -

given to the police. Her computer had been taken away and given to the police."[12]

Murphy testified that she then met with Edwards and told her she was removing Natalie from the home. According to Murphy, Edwards responded that she did not believe Natalie's disclosure that she had been abused. Natalie was placed with her grandparents.

### The Forensic Biology Lab Supervisor

The next witness to testify was Cara Lupino, supervisor of the forensic biology lab at the Department of Health. Lupino stated that her lab examines evidence in cases of violent crimes and sexual assaults and that, in this case, she examined the rape kit and the samples taken from the bedding in Natalie's room. Lupino testified that the oral and vaginal swabs in the rape kit tested negative for the presence of seminal fluid. She further testified that state's exhibit No. 4, a black and white comforter from Natalie's room, tested positive for seminal fluid and had sperm cells present in the stain. Lupino testified that the DNA profile of the comforter stain matched the DNA profile of defendant's reference sample.[13] Finally, Lupino testified that a test of state's exhibit No. 5, the bedsheet from Natalie's bed, revealed seminal fluid but no sperm cells; she noted that this is "commonly encountered with males who have a low sperm count or have a vasectomy." DNA testing, according to Lupino, demonstrated a match to defendant and Natalie, as well as potentially to a third person. In her testimony, Lupino noted that DNA is contained in skin cells and "potentially anybody who had contact with an item could leave skin cells behind."

---

[12] Edwards admitted that she did take away Natalie's phone and computer, although there is no indication that they were turned over to the police. According to Edwards, she took away the phone after finding "inappropriate sexting from [Natalie's] girlfriend."

[13] Regarding the possibility that the DNA profile could match with anyone other than defendant, Lupino stated: "According to the database that we use which is built by the FBI, in the U.S. Caucasian population it is seen in 1 in every $9.37$ times 10 to the 16 people which is approximately 93 quintillion people."

## The Landlord

Matthew Stamp, landlord for both Barbato and defendant, was the next witness to testify. Stamp testified that defendant had been his tenant since 2008 and that Barbato had been his tenant for four months. He testified to several complaints he received from each of them about the other, culminating with a plumbing problem in which "a bunch of mail cut up in pieces" was found to be clogging the pipes after there had been allegations of mail theft in the building. Stamp noted that he had received no complaints about defendant prior to Barbato's tenancy.

## The Mother's Friends

The next witness to testify was Jessica Lohrke, a friend of Edwards's who was present at Burlingame's house on the evening of March 10 when Natalie was being questioned. Lohrke testified that she was present for approximately twenty to thirty minutes during the latter part of the questioning of Natalie, that she did not ask any direct questions herself, and that Natalie "was crying at certain times and she just kind of kept raising her shoulders and didn't answer questions." Lohrke testified that she felt "[s]ome of the facts didn't add up of what [Natalie] was saying; her timeline when things were happening, the way she was acting, the way she was. She just wouldn't talk." However, Lohrke admitted that she did not hear the earlier questioning and that her view of whether Natalie was acting "appropriately" would have changed had she known that, earlier, Natalie's uncle had told Natalie that her stepfather would be killed in jail and that a lawyer would "shred her apart."

The next witness to testify was Edwards's childhood friend, Jennifer Desper. Desper testified that she was also present on March 10 at the Burlingame house and that she went into the room with Natalie after the girl had been questioned by her mother and her uncle. According to Desper, after she shared her own history of having been the victim of a sexual

- 11 -

assault, she and Lohrke asked Natalie, "[D]id this happen to you?" and she responded "no." Desper testified that, when asked why she had made the allegation, Natalie replied, "I just wanted him gone." Desper testified that, at the time, she was not aware of the tone of the questioning that had taken place immediately prior to her discussion with Natalie.

### The Mother

Natalie's mother, Penelope Edwards, testified that she has been married to defendant for five years, since Natalie was nine years old. Edwards testified that Natalie's sister, Katy, has her own bedroom but does not sleep in it. Instead, she sleeps with one of her parents in the master bedroom, and the other parent sleeps in Katy's room. Edwards further testified that, on nights when Natalie is not at home, she and defendant sleep in Natalie's bed, because it is bigger.

On Friday evening, March 4, according to Edwards, Natalie slept at a friend's house and defendant slept in Natalie's bed. Edwards testified that she left her bed and joined defendant in Natalie's bed where they began to "fool around" before being interrupted by Katy. Edwards testified that she left Natalie's bedroom, telling defendant, "I'm going back to bed with [Katy], take care of it yourself if you need to, sorry."

Edwards testified that the next evening, the night of the alleged assault, she retired with Katy at around 10:30 p.m. and did not hear anything unusual during the night. Edwards testified that she first suspected her daughter was lying when they returned from the hospital after defendant had been removed from the house and Natalie seemed "floaty and happy." Edwards testified that her own mother observed this and asked, "Penny, do you think she's lying?" Edwards stated that she did not feel that Natalie's story made sense. She testified that Natalie told her, "I've been trying [to] get rid of [defendant] for years," and claimed that Natalie blamed

defendant for her breakup with her boyfriend. Edwards further testified that she believed Natalie's friends were encouraging her to lie.

Edwards testified that the meeting at Burlingame's house was intended "[t]o get the truth of what was going on" and that she and her brother taped the questioning "[j]ust to have it, just to hear it, to have it to show what [Natalie] was saying." Edwards testified that she did not tell Natalie the reason for their visit to Burlingame's house. According to Edwards, she was angry and aggravated when she questioned Natalie. Edwards admitted that she did not believe her daughter and that she demanded details when she questioned her in the basement. Edwards testified that she yelled at Natalie, saying, "[Y]ou're such a f * * * ing liar" and that, at one point, Natalie responded "[O]kay, I'm lying, is that what you want to hear?" Finally, Edwards testified, Natalie said, "I lied. I didn't think it would affect this many people."

**The Defendant**

The final witness at the hearing was defendant. The defendant testified that he and Barbato "argued a few times over several things that had happened," and that he called the police on several occasions regarding these disputes. The defendant testified that, as a result of the problems he was having with the neighbors, in late February 2011, he decided to move. The defendant testified that he and Natalie had arguments or disagreements over the plan to move and the earlier breakup with her boyfriend.

According to defendant, he and Edwards had intimate relations in Natalie's bed two to four times a month. He went on to testify that Natalie had the largest bed and the largest bedroom in the house. The defendant testified that he and Edwards began to be intimate on Friday evening, March 4, but were interrupted and he later "pleasured himself." He noted that he had had a vasectomy. The following evening, according to defendant, he brought Natalie a

milkshake as she had requested, but he stated that he left the room, spent time on the computer and then went to bed in Katy's room, where he remained until morning. The next morning, after going to breakfast with Natalie and her mother and sister, defendant testified that the family shopped for supplies to paint Natalie's room because "[he] had been promising her we were going to paint the bedroom the last six months."

The defendant stated that he had "never, never ever" done anything sexually inappropriate with Natalie. He testified that he had had several phone conversations with Edwards, and that she had visited him at the ACI on March 12, 2011, at which time "She told me * * * that [Natalie] had taken her story back and they had a tape recording on it." The state offered defendant's criminal record as exhibit No. 7, and it was entered in full without objection. When asked if he "was convicted of" a 1987 second-degree sexual assault, defendant said, "I pled guilty to a large assortment of charges as a plea agreement." When asked, "I want to know simply did you lie to the Judge when you pled guilty?" defendant testified, "Yes, I lied to the Judge."

At the conclusion of the violation hearing, the hearing justice set forth in rather extensive detail the credibility assessments and factual findings supporting her conclusion that defendant had failed to keep the peace and be of good behavior, in violation of the terms of his probation. The hearing justice sentenced defendant to serve twenty-five years in each of the nine concurrent sentences referenced in the probation-violation report. On April 13, 2011, defendant filed notices of appeal; final judgments were entered on April 18, 2011.[14]

---

[14] The defendant filed this appeal prior to the entry of final judgment, however "this Court has stated that it will treat a premature appeal as if it had been timely filed." Chapdelaine v. State, 32 A.3d 937, 941 n.1 (R.I. 2011) (quoting Bleau v. State, 968 A.2d 276, 278 n.1 (R.I. 2009) (mem.)).

**Standard of Review**

"At a probation-violation hearing, '[t]he sole issue for a hearing justice * * * is whether or not the defendant has breached a condition of his or her probation by failing to keep the peace or remain on good behavior.'" State v. Ford, 56 A.3d 463, 468 (R.I. 2012) (quoting State v. English, 21 A.3d 403, 406 (R.I. 2011)). Because probation-violation hearings are not part of a criminal prosecution, "the 'burden of proof at a probation-violation hearing is much lower than the standard of beyond a reasonable doubt' used in criminal trials." Id. (quoting English, 21 A.3d at 406-07). In fact, "the state need only show that reasonably satisfactory evidence supports a finding that the defendant has violated his or her probation." Id. at 468-69 (quoting English, 21 A.3d at 407). To make this determination, "the hearing justice 'weighs the evidence and assesses the credibility of the witnesses.'" Id. at 469 (quoting English, 21 A.3d at 407). This Court accords "great deference" to the hearing justice's credibility assessments. Id. (quoting English, 21 A.3d at 407). We have often stated that this Court "will not 'second-guess' supportable credibility assessments of a hearing justice in a probation-revocation hearing." Id. (quoting State v. Jackson, 966 A.2d 1225, 1229 (R.I. 2009)). Instead, our review is "limited to considering whether the hearing justice acted arbitrarily or capriciously in finding a violation." Id. (quoting English, 21 A.3d at 407).

**III**

**Discussion**

On appeal, defendant argues that the hearing justice's credibility findings were arbitrary and capricious because they were unsupported by facts. The defendant asserts that Natalie's testimony was not credible due to her inability to remember very recent events and due to the

allegations of penetration and oral sex that she made to Murphy, the CPI, as well as during her basement interrogation, that were not reflected in her testimony before the court. Further, defendant argues that the tone of the interrogation troubled the hearing justice such that she relied on it in rendering her decision; defendant asserts that, however ill-advised that interrogation was, he "had nothing to do with this inquisition." The defendant argues that the consistency of Natalie's testimony with that of her friends Riley and Sarah is attributable to the fact that they "were in cahoots." Further, defendant points to Sarah's testimony that Natalie told her defendant drugged her and put duct tape over her mouth—a statement that Natalie denied making—as demonstrating that either Natalie lied or the girls could not "keep their stories straight." Finally, defendant argues that the consistencies that the hearing justice found between Natalie's testimony and the evidence could also be consistent with defendant's assertion that the alleged abuse never took place.[15]

We note that a probation-revocation hearing does not require "the full panoply of rights due a defendant in * * * a criminal proceeding." Ford, 56 A.3d at 468 (quoting State v. Kennedy, 702 A.2d 28, 31 (R.I. 1997)). Here, defendant had the benefit of a five-day hearing, during which no fewer than thirteen witnesses gave testimony. Five of these witnesses testified for defendant. The hearing justice noted that defendant's hearing "lasted longer than many criminal trials." Nevertheless, the standard employed in probation-violation hearings is considerably lower than that which applies in criminal prosecutions; "the state need only show that reasonably

---

[15] The defendant also appears to argue that the swift timetable of sixteen days from arrest to probation-violation hearing somehow prejudiced him. However, because the hearing justice took pains to ascertain that defendant was ready to proceed at the start of the hearing, and because defendant responded in the affirmative each time he was asked if he had had adequate time to discuss the case with his attorney, we need not address this argument.

satisfactory evidence supports a finding that the defendant has violated his or her probation." Id. at 468-69 (quoting English, 21 A.3d at 407).

The hearing justice, in a thorough decision, stated that she was "not only reasonably satisfied that [defendant] sexually assaulted [Natalie] on March 6, 2011, and over the course of the four years before that, I am near certain of it * * * ." In her decision, the hearing justice specifically found Natalie's testimony to be credible and consistent with the testimony of both Riley and Sarah, whom she also found to be credible. The hearing justice addressed the inconsistency in Sarah's testimony that Natalie told her that defendant drugged and duct-taped her. The hearing justice allowed for the possibility that some of the details were wrong, but she also stated,

> "Maybe they weren't wrong which made [Natalie] deny saying at the hearing but that does not undermine [Natalie's] hearing testimony. The fact that not all of the friends' recollections were in the police statements that they gave is also understandable as the focus there was not on the past conversations or events but on the disclosures that occurred in March of 2011."

Likewise, the hearing justice found Natalie's testimony to be consistent with what she said during her "grueling interrogation" on March 10. The CD recording of the several-hours-long interrogation was entered into evidence as a joint exhibit. The defendant argues that the hearing justice "was obviously very troubled" by the basement interrogation, such that she concluded that Natalie's recantation was coerced. We are similarly troubled. In her decision, the hearing justice found that the recantation "was coerced and involuntary. Her recantation came only after she was convinced that she would not be released from the basement interrogation room until she said it didn't happen, even if it did, and no one can really claim[] otherwise who has not listened to the [CD]." We concur. It is difficult to conjure a more coercive environment than this—a fourteen-year-old child subjected to several hours of pleading, mocking, screaming,

- 17 -

and threats from her mother, her uncle, and three other adults who, all the while, claimed to love and support her. Nevertheless, Natalie withstood this interrogation for hours before finally recanting. Further, days later when her uncle realized the gravity of the injustice he had perpetrated against his niece, Natalie took the opportunity to disavow her recantation. We recognize, as defendant argues, that he "had nothing to do with this inquisition," yet the tape was admitted as a joint exhibit. We cannot say that the hearing justice erred by relying upon the tape in assessing Natalie's credibility.

Finally, the hearing justice found defendant's testimony to be unworthy of belief. She found that, not only did defendant have an incentive to lie, but that his testimony about his own actions, including sleeping and having sex in Natalie's bed, "radiates control of your victim and manipulation." Further, the hearing justice noted that, when confronted with his earlier conviction, after a plea of nolo contendere to sexual assault, defendant said that he lied to the court when he admitted, under oath, that he had committed that offense. We are satisfied that the record provides ample support for the hearing justice's determination that defendant's testimony was not credible.

The defendant's appeal is based on the argument that the hearing justice's determination of the credibility of the witnesses before her was arbitrary and capricious. On the contrary, the record discloses that the hearing justice carefully and thoroughly reviewed the testimony and evidence in concluding that she was reasonably satisfied that the defendant failed to keep the peace or remain on good behavior. See Ford, 56 A.3d at 468. The hearing justice presided over five days of testimony and was in the best position to assess the credibility of each of the thirteen witnesses who testified before her. We have often stated that we will not "second-guess supportable credibility assessments of a hearing justice in a probation-revocation hearing * * * ."

- 18 -

Id. at 469 (quoting Jackson, 966 A.2d at 1229).  We will not do so now.  The record of this case reflects ample support for the hearing justice's credibility assessments.  From her unique perspective on the bench, she relied on her own observations of the various witnesses, primarily the complaining witness and the defendant.  Based upon our review of the record, we cannot say that her findings were arbitrary or capricious, and we affirm her adjudication of probation violation.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgments of the Superior Court. The papers in this case may be returned to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:** State v. Robert Raso.

**CASE NO:** No. 2011-364-C.A.
(P1/90-250A)
(P1/90-248A)
(P1/90-247A)
(P1/90-246A)
(P1/89-1667A)
(P1/89-941A)
(P1/87-2828A)
(P1/87-482A)

**COURT:** Supreme Court

**DATE OPINION FILED:** December 3, 2013

**JUSTICES:** Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:** Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:** Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Judith C. Savage

**ATTORNEYS ON APPEAL:**

For State: Virginia M. McGinn
Department of Attorney General

For Defendant: Catherine Gibran
Office of the Public Defender