June 12, 2025

**Supreme Court**

No. 2022-196-C.A. (P1/90-248A)
No. 2022-197-C.A. (P1/90-247A)
No. 2022-198-C.A. (P1/90-246A)
No. 2022-199-C.A. (P1/90-250A)
No. 2022-208-C.A. (P1/89-1667A)
No. 2022-209-C.A. (P1/89-941A)
No. 2022-210-C.A. (P1/87-2828A)
No. 2022-211-C.A. (P1/87-482A)

State              :

   v.              :

Robert Raso.              :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email:    opinionanalyst@courts.ri.gov,    of    any typographical  or  other  formal  errors  in  order  that corrections may be made before the opinion is published.

**Supreme Court**

No. 2022-196-C.A. (P1/90-248A)
No. 2022-197-C.A. (P1/90-247A)
No. 2022-198-C.A. (P1/90-246A)
No. 2022-199-C.A. (P1/90-250A)
No. 2022-208-C.A. (P1/89-1667A)
No. 2022-209-C.A. (P1/89-941A)
No. 2022-210-C.A. (P1/87-2828A)
No. 2022-211-C.A. (P1/87-482A)

State                         :

v.                            :

Robert Raso.                  :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

# O P I N I O N

**Justice Goldberg, for the Court.**   When a defendant is sentenced to imprisonment for violating a suspended or a probationary sentence, G.L. 1956 § 12-19-18 allows a motion to terminate the sentence of imprisonment under certain circumstances.  The defendant contends that these consolidated appeals implicate one of those circumstances—when the criminal charge supporting the violation "fails to proceed in District or Superior Court under circumstances where the state is indicating a lack of probable cause, or circumstances where the state or its agents

- 1 -

believe there is doubt about the culpability of the accused." Section 12-19-18(b)(5).[1]

For the reasons discussed, we conclude that this provision is not triggered under the present circumstances. Accordingly, we affirm the Superior Court's order denying the motion to terminate imprisonment.

## Facts and Travel

In 1990, Robert Raso (Raso or defendant) pled nolo contendere to twenty-six criminal charges, including second-degree sexual assault, felony assault, arson, assault with intent to commit murder, and various robberies. On the arson and eight robbery convictions—which comprised eight different Superior Court cases— defendant was sentenced to forty years at the Adult Correctional Institutions, with twelve years to serve and twenty-eight years suspended with probation, concurrently. As time passed, Raso was eventually released from the ACI and began serving his probationary sentence.

---

[1] At oral argument, the defendant argued that these consolidated appeals were not limited to G.L. 1956 § 12-19-18(b)(5) but also encompassed the other provisions of subdivision (b). The record is clear that, during the motion-to-terminate proceeding, the defendant twice advised the Superior Court that the motion to terminate was brought pursuant to § 12-19-18(b)(5) only, and the Superior Court's decision denying the motion to terminate was understandably limited to § 12-19-18(b)(5) only. Accordingly, the defendant's invitation that this Court consider § 12-19-18(b)(1)-(4) is waived and we have no occasion to consider it. *See, e.g.*, *State v. Tavares*, 312 A.3d 449, 458 (R.I. 2024) ("As we have said on innumerable occasions, a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court.") (quoting *State v. Barros*, 148 A.3d 168, 172 (R.I. 2016)).

On March 8, 2011, the state filed a probation-violation report pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure, alleging that Raso violated the terms and conditions of probation. The Rule 32(f) probation-violation report was filed in the eight cases that comprised the arson and the eight robbery convictions only. Two weeks later, a probation-violation hearing commenced.[2] It lasted five days during which thirteen witnesses testified. Because the events that preceded the finding that defendant violated the terms and conditions of probation— as well as this Court's affirmance of that determination—are germane to the matter currently before this Court, we recount the necessary details. *See State v. Raso*, 80 A.3d 33 (R.I. 2013). The facts are troubling.

### The Probation-Violation Hearing

The state's probation-violation report was based upon the allegations that defendant had sexually assaulted his fourteen-year-old stepdaughter, whom we previously referred to by the fictitious name Natalie. *Raso*, 80 A.3d at 34-35. The most recent allegation of sexual abuse occurred on March 6, 2011, two days before the probation-violation report was filed. *Id.* at 35. During the probation-violation hearing, Natalie testified that around midnight on March 6, 2011, she awoke and discovered that defendant had climbed into her bed. *Id.* Natalie recounted "that defendant removed her pajama bottoms and touched her chest and her vagina with

---

[2] The probation-violation hearing was combined with a bail hearing.

- 3 -

his hands and his mouth." *Id.* During her testimony, Natalie also related that defendant's sexual misconduct began when she was "nine or ten" and occurred on "more than ten" occasions. *Id.*

On March 10, 2011, under duress from members of her family, including her mother, Natalie recanted the allegations of sexual abuse and testified during the probation-violation hearing concerning the circumstances surrounding this brief repudiation. *Raso*, 80 A.3d at 36. Natalie explained that on March 10, 2011, she was brought to the basement of her mother's friend's home (Heather Burlingame) and interrogated for more than three and a half hours by her uncle (Ian Sateikis), Burlingame, and her mother (Penelope Edwards), who at the time was married to defendant. *Id.* We previously described the ordeal perpetrated upon fourteen-year-old Natalie a mere four days after the latest incident of sexual abuse:

> "Throughout a more than three-hour barrage of questions and accusations that she was lying, during which her mother told her that she was 'a f * * * ing liar' and that defendant would 'die in jail,' Natalie maintained that her stepfather had molested her. Natalie recalled that Burlingame told her that Natalie herself could be prosecuted. Eventually, however, Natalie told her mother 'it wasn't true.' She testified that she did so because her mother did not believe her, and that once she recanted, the questioning stopped." *Id.*

The next day, Natalie provided a statement to the Burrillville Police Department stating, "it wasn't true." *Id.* Natalie testified that she provided this statement "[b]ecause [she] wanted it to be over." *Id.*

- 4 -

During Natalie's probation-violation testimony, the trial justice (first trial justice) granted a request for a short recess. *Raso*, 80 A.3d at 35 n.6. When testimony resumed, the first trial justice noted:

> "I think it's important that the record reflect, as it certainly can't when it doesn't reflect with words, the difficulty with which this witness had prior to the recess in giving her testimony. There were long pauses between the answers and, in addition, she was extremely tearful and shaking * * *. [T]his witness, albeit 14 years old, does not present as someone who, of that age, who may be able to handle everything that comes their way and appeared to me to be suffering unreasonable and unnecessary emotional harm in giving this testimony * * *." *Id.*

Sateikis also testified concerning the evening of March 10, 2011, when he brought Natalie to Burlingame's home. *Raso*, 80 A.3d at 36. He explained that Edwards gave him a digital recorder for the interrogation, but rather than placing the recorder in plain view, Sateikis secreted the device in his sweatshirt pocket. *Id.* A half-hour into the grilling—and while the recorder remained hidden—Sateikis began recording. *Id.* at 36-37. After two hours, Sateikis left the basement and returned upstairs to talk to Edwards, advising her, "I don't think we're going to get anything." *Id.* at 37. Thereafter, Edwards began questioning Natalie for "45 minutes, half an hour," a process Sateikis likened to "[s]ort of like an interrogation style." *Id.* Sateikis added that "Natalie's demeanor was silent at first, but that she started 'getting more frustrated,' 'more upset' and that she was crying and her voice was 'shaky.'" *Id.*

Throughout this barrage, Natalie steadfastly maintained that defendant had sexually assaulted her until Edwards declared that she wanted to speak with Natalie alone; accordingly, Sateikis and Burlingame—as well as two additional friends of Edwards who had joined the fray—departed the basement. *Raso*, 80 A.3d at 37. About twenty or thirty minutes later, Edwards emerged from the basement with her arm around Natalie and announced that "[Natalie] told the truth, that she lied."[3] *Id.* The more than three-hour basement interrogation was over.

Ann Murphy, a child protective investigator for the Department of Children, Youth, and Families, also testified that on March 6, 2011, she received a call concerning Natalie and initiated an investigation. *Raso*, 80 A.3d at 37-38. Murphy recalled that when she confronted Natalie concerning allegations that defendant had sexually abused her, Natalie "began crying 'very hard,' and, in answer to direct questions, affirmed that her stepfather, defendant, had touched her without her consent and that the last time this had occurred was the previous night." *Id.* at 38. Murphy added that according to Natalie, the sexual misconduct occurred "about

---

[3] Sateikis testified that on March 15, 2011, he went to the Burrillville Police Department and provided a statement expressing regret concerning the manner in which Natalie was interrogated. *See State v. Raso*, 80 A.3d 33, 37 (R.I. 2013). Sateikis related that after leaving the police station, he spoke to Natalie and apologized. *Id.* He also recounted that Natalie conveyed that she recanted because "she thought it would be over faster and her mom wouldn't believe her anyway." *Id.*

once a week over four years" and included penile penetration of Natalie's mouth and vagina, as well as defendant engaging in cunnilingus. *Id.*

Notably, Murphy testified that the following day—after police had removed the sheets from Natalie's bed—Edwards telephoned her and advised that defendant's hair might be found on the sheets because he had slept there Friday night, March 4, 2011. *Raso*, 80 A.3d at 38. Murphy explained that the next day, March 8, 2011, Edwards again contacted her and warned that if sperm was found on Natalie's sheets, "it could be because defendant had 'done something with himself on the bed.'" *Id.*

Cara Lupino, the supervisor of the forensic biology lab at the Department of Health, testified that a comforter taken from Natalie's room tested positive for seminal fluid and contained sperm cells and that a sheet taken from Natalie's bed revealed seminal fluid but contained no sperm cells. *Raso*, 80 A.3d at 39. Lupino indicated that the statistical possibility that the DNA retrieved from the comforter belonged to someone other than Raso was "in the U.S. Caucasian population it is seen in 1 in every 9.37 times 10 to the 16 people which is approximately 93 quintillion people." *Id.* at 39 n.13.

Edwards and defendant also testified during the probation-violation hearing. *Raso*, 80 A.3d at 40-41. Edwards explained that on the evenings when Natalie was not home, she and defendant would sleep in Natalie's bed because it was larger than

their own bed. *Id.* at 40. Edwards detailed that on Friday, March 4, 2011, Natalie slept at a friend's house and that she and defendant slept in Natalie's bed. *Id.* She further explained that while in Natalie's bed, she and defendant began to "fool around" but were interrupted by their four-year-old daughter, whom we previously referred to by the fictitious name Katy. *Id.* According to Edwards, she left Natalie's bed and informed defendant, "I'm going back to bed with [Katy], take care of it yourself if you need to, sorry." *Id.*

Finally, defendant testified that he and Edwards had intimate relations in Natalie's bed between two and four times a month. *Raso*, 80 A.3d at 41. Raso averred that he and Edwards started becoming intimate in Natalie's bed on Friday evening, March 4, 2011, but were interrupted and he later "pleasured himself." *Id.* Raso denied the allegations of sexual abuse, stating that he had "'never, never ever' done anything sexually inappropriate with Natalie." *Id.* When questioned during the probation-violation hearing if he had been convicted of second-degree sexual assault, defendant responded, "I pled guilty to a large assortment of charges as a plea agreement." *Id.* Upon further being asked, "I want to know simply did you lie to the Judge when you pled guilty?" defendant admitted, "Yes, I lied to the Judge." *Id.*

At the conclusion of the probation-violation hearing, the first trial justice found that defendant violated the terms and conditions of probation and minced no

words. *Raso*, 80 A.3d at 41.  She observed that Raso had a five-day hearing, which the first trial justice described as "one of [the] most gut-wrenching sagas that I have heard in my eighteen years on the bench."  The first trial justice added that the five-day probation-violation hearing "lasted longer than many criminal trials" and that thirteen witnesses testified, including five called by the defense.

Having carefully listened to the testimony and observed the witnesses, the first trial justice made clear credibility findings.  She concluded that Natalie's in-court and sworn testimony "never wavered," "was fraught with pain and anguish," and "was credible and convincing."  On the other hand, the first trial justice rejected defendant's testimony, finding that not only did he have "every incentive to lie in this proceeding, not the least of which is the 28 years in prison that he is facing if [Natalie] is believed," but that "he did lie [about committing the prior sexual assault]."  The first trial justice added, "Mr. Raso, you lied to me about having lied before and regardless, if you lie to the [c]ourt then, then you cannot be believed."

The first trial justice continued her evaluation, stating that defendant's testimony "radiates control of your victim and manipulation."  Critically, the first trial justice declared that she was "not only reasonably satisfied that [defendant] sexually assaulted [Natalie] on March 6, 2011 and over the course of the four years

- 9 -

before that, *I am near certain of it * * *.*"[4] (Emphasis added.)  She revoked the suspended sentences and ordered Raso to serve twenty-five years in each of the eight cases referenced in the probation-violation report, concurrently.  Raso appealed the probation-violation determination to this Court, which we affirmed. *Raso*, 80 A.3d at 44.

---

[4] The first trial justice also addressed the March 10, 2011 basement interrogation of Natalie, describing it as "a perverted, misguided effort to investigate the alleged crime or perhaps more accurately to secure what they believed to be the truth, that [Natalie] had lied about the molestations by the defendant and must admit that she lied."  The first trial justice concluded that she

> "does not accept as true [Natalie's] recantation or her statement to the police that immediately followed it denying the defendant's sexual assaults of her.  That recantation, in this [c]ourt's view, was coerced and involuntary.  Her recantation came only after she was convinced that she would not be released from the basement interrogation room until she said it didn't happen, even if it did, and no one can really claim[] otherwise who has not listened to the audiotape.  By then her mother had punished her for days by taking away her cellphone and computer and keeping her out of school and subjected [Natalie] to the most horrendous interrogation imaginable, especially for a child who just disclosed sexual abuse.  Mother did all this contrary to the expressed instructions of DCYF to support her until she could speak to the police and undergo counselling."

Similarly, we observed, "[i]t is difficult to conjure a more coercive environment than this—a fourteen-year-old child subjected to several hours of pleading, mocking, screaming, and threats from her mother, her uncle, and three other adults who, all the while, claimed to love and support her." *Raso*, 80 A.3d at 43.  Years after our initial observation, we remain appalled by this conduct.

- 10 -

**The Motion-to-Terminate Hearing**

In March 2011, a criminal complaint was filed in District Court charging Raso with one count of first-degree sexual assault relating to the events of March 6, 2011. As discussed, the first-degree sexual assault charge served as the basis for the determination that Raso had violated the terms and conditions of probation. With respect to the charge of first-degree sexual assault, on September 13, 2011, defendant filed a motion to dismiss and a motion for a speedy trial.[5] The state subsequently filed a notice dismissing the charge of first-degree sexual assault, pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure. In relevant part, the notice of dismissal advised that "the [s]tate is moving for dismissal without prejudice in recognition that six months has elapsed from the time of * * * defendant's arraignment in District Court on March 7, 2011." The Rule 48(a) notice of dismissal added that "[n]othing herein should be interpreted as suggesting a lack of probable cause to believe that * * * defendant committed these offenses or that the [s]tate in any way believes there is a doubt about * * * defendant's culpability." The following day, the first-degree sexual assault case was closed.

---

[5] The motion to dismiss was filed pursuant to G.L. 1956 § 12-13-6, which provides that "[e]very person who shall be imprisoned upon suspicion of having committed an offense for which bail may be denied pursuant to the provisions of R.I. Const., Art. I, Sec. IX shall be bailed or discharged if not indicted or charged by information within six (6) months after the commitment."

In due course, defendant filed a motion to terminate the twenty-five-year sentence he received as a result of being declared a probation violator. A three-day hearing ensued before a trial justice (second trial justice) in the Superior Court. During the motion-to-terminate hearing, the prosecutor assigned to the probation-violation hearing—and who was among the signatories to the Rule 48(a) notice of dismissal—testified. The prosecutor revealed that he did not believe the recantation but rather credited Natalie's original allegation that she had been sexually assaulted by defendant. The prosecutor further testified that the charge of first-degree sexual assault was not presented to the grand jury because the Office of the Attorney General was "satisfied with the sentence that we received from [the first trial justice] on the [probation] violation." When asked about the timing of the determination to file the Rule 48(a) notice of dismissal, the prosecutor elucidated that he "was considering that from the day [defendant] was sentenced * * * when he was sentenced on the violation, that was in my mind. So I started considering that the moment [the first trial justice] gave him 25 years."

The prosecutor further described that in considering whether to file a notice of dismissal, he relied upon the first trial justice's finding that she was "not only reasonably satisfied that [defendant] sexually assaulted [Natalie] on March 6, 2011 and over the course of the four years before that, *I am near certain of it * * **.*" (Emphasis added.) The prosecutor also testified that Natalie's biological father,

- 12 -

who was "pretty emotional" during the probation-violation hearing, emphatically declared that his daughter would not testify at another hearing. In this respect, the prosecutor related that when Natalie was taking the witness stand during the probation-violation hearing, it was his hope that "we would get a good result and this would be the last time she would have to go through what she did."

In sum, the prosecutor testified that the reason for the Rule 48(a) notice of dismissal was dual: The state was satisfied with the twenty-five-year sentence imposed upon defendant and the state wanted to spare Natalie from the emotional trauma caused by testifying at another hearing or trial. The prosecutor affirmed that the language contained within the Rule 48(a) notice of dismissal expressing that dismissal should not be interpreted as suggesting a lack of probable cause was true and accurate, both at the time he signed the notice of dismissal and at the time of his testimony.

At the conclusion of the three-day motion-to-terminate hearing, the second trial justice issued a bench decision and denied the motion to terminate the sentence of imprisonment. In so doing, the second trial justice firmly announced that "there's no issue and no doubt as to probable cause or the culpability of the defendant." On

May 17, 2019, defendant filed a notice of appeal in all eight cases.[6]  We

consolidated the appeals.

**Standard of Review**

"It is well established that the factual findings of a hearing justice sitting

without a jury are accorded great weight and will not be disturbed unless the record

shows that the findings clearly are wrong or the hearing justice overlooked or

misconceived material evidence." *State v. Murray*, 216 A.3d 1234, 1240 (R.I. 2019)

(brackets omitted) (quoting *Kilmartin v. Barbuto*, 158 A.3d 735, 746-47 (R.I.

2017)).  "This Court reviews 'questions of statutory interpretation *de novo*.'" *Id.* at

1240-41 (quoting *State v. Hazard*, 68 A.3d 479, 485 (R.I. 2013)).

**Discussion**

On appeal, Raso challenges the second trial justice's decision to deny the

motion to terminate his sentence.  Despite its plain language, he contends that the

clear intent of § 12-19-18(b)(5) is that if a criminal prosecution is not pursued—for

any reason—a defendant "may not continue to be incarcerated on the basis that a

[trial] justice was 'reasonably satisfied' [that the defendant] committed that new

---

[6] At the time defendant's notices of appeal were filed, an order memorializing the denial of the motion to terminate imprisonment had not formally entered. Subsequently, this Court remanded the eight consolidated cases to the Superior Court for entry of an order denying the motion to terminate, which the Superior Court executed.  "This Court has consistently considered a notice of appeal filed prior to the entry of the judgment or order appealed from to be timely." *State v. Murray*, 216 A.3d 1234, 1239 n.5 (R.I. 2019).

offense." According to defendant, the state cannot circumvent § 12-19-18(b)(5) by filing a Rule 48(a) notice of dismissal and declaring that the dismissal was "not for lack of probable cause." The defendant's arguments are without merit.

We begin by rejecting the premise of defendant's expansive argument that § 12-19-18(b)(5) contains a "catch-all" intended to prohibit a probation-revocation hearing from replacing the more rigorous scrutiny of a criminal trial during which the state must prove the defendant's guilt beyond a reasonable doubt. As this Court previously recognized, in the case of a deferred sentence or a suspended sentence, "the guilt of the convicted accused has been established * * *." *State v. Plante*, 109 R.I. 371, 377, 285 A.2d 395, 398 (1972). However, "as an act of grace, one is given a sentence, the execution of which is suspended * * *." *Id.*

In this matter, defendant was afforded the full panoply of due-process rights with respect to the arson and eight robbery charges and he pled nolo contendere; he was sentenced to forty years at the ACI, with twelve years to serve and twenty-eight years suspended with probation, concurrently. The twenty-eight-year probationary sentence permitted Raso to continue serving his sentence outside the prison walls but conditioned this act of grace on defendant's promise to keep the peace and be on good behavior while on probation. *See Plante*, 109 R.I. at 378, 285 A.2d at 398. The events of March 6, 2011, clearly demonstrated that defendant breached that promise and, after finding that defendant violated the terms and conditions of

- 15 -

probation, the first trial justice revoked twenty-five years of the previously suspended twenty-eight-year sentence.

Raso also suggests that § 12-19-18(b)(5) is ambiguous and evinces the General Assembly's intent that a defendant may not continue to be imprisoned when the basis for incarceration is conduct that was not proven beyond a reasonable doubt during a criminal trial. *Contra* § 12-19-18(c) ("This section * * * shall not alter the ability of the court to revoke a suspended sentence or probationary period for an allegation of conduct that does not rise to the level of criminal conduct."). We have previously rejected this argument.

In *State v. White*, 37 A.3d 120 (R.I. 2012) (mem.), a criminal information was filed but later dismissed pursuant to Rule 48(a). *White*, 37 A.3d at 121. The defendant asserted that because the state dismissed the underlying criminal charge, which was the predicate for the finding of violation, his incarceration must terminate. *Id.* at 122. We rejected this argument and declared § 12-19-18 "unambiguous as it applies to deferred sentence agreements." *Id.* We explained that "[b]y its clear language, relief is available when 'the grand jury has failed to return any indictment or an information has *not been filed* on the charge which was specifically alleged to have constituted the violation of the deferred sentence * * *.'" *Id.* (quoting § 12-19-18).[7] Because the state filed a criminal information,

---

[7] This provision is at present codified in § 12-19-18(a).

we concluded that the plain language of § 12-19-18 did not provide the defendant relief. *Id.*

Here, Raso similarly ignores the plain and unambiguous language of § 12-19-18(b)(5), which provides:

> "Whenever any person, after an evidentiary hearing, has been sentenced to imprisonment for violation of a suspended sentence or probationary period by reason of the alleged commission of a felony or misdemeanor said sentence of imprisonment shall, on a motion made to the court on behalf of the person so sentenced, be quashed, and imprisonment shall be terminated when any of the following occur on the charge which was specifically alleged to have constituted the violation:

> "* * *

> "(5) The charge fails to proceed in District or Superior Court *under circumstances where the state is indicating a lack of probable cause, or circumstances where the state or its agents believe there is doubt about the culpability of the accused*." (Emphasis added.)

"When the language of a statute is clear and unambiguous, this Court interprets the statute literally and gives the words their plain and ordinary meanings." *White*, 37 A.3d at 122. "In the absence of any ambiguity, this Court need not engage in statutory construction, and must apply the statute as written." *Id.* Applying these well-established rules of statutory construction, we are satisfied that there is no indication that the first-degree sexual assault charge failed to proceed in District Court or Superior Court "under circumstances where the state is indicating a lack of

- 17 -

probable cause, or circumstances where the state or its agents believe there is doubt about the culpability of the accused." Section 12-19-18(b)(5). Our precedent supports this conclusion.

In *Murray*, the state filed a probation-violation report alleging that the defendant violated his probation based upon his involvement in a domestic-violence incident. *Murray*, 216 A.3d at 1236. After a hearing, the trial justice declared that the defendant violated his probation and ordered that he serve thirteen years of a previously suspended sentence. *Id.* at 1237. The state subsequently dismissed the domestic-violence charges pursuant to Rule 48(a), and the defendant responded by filing a motion to terminate incarceration pursuant to § 12-19-18(b)(5), arguing that the dismissal was due to a lack of probable cause. *Id.* at 1237-38. The Rule 48(a) notice of dismissal indicated: "The state is dismissing these charges in the interest of sparing the victim any further trauma from repeated court appearances. This dismissal shall in no way be construed to imply that the state indicates a lack of probable cause or any doubt of the culpability of the defendant." *Id.* at 1238 (brackets omitted).

We rejected the defendant's argument that the circumstances presented in *Murray* required the termination of his imprisonment. *Murray*, 216 A.3d at 1241. In particular, this Court explained that the Rule 48(a) notice of dismissal indicated that the reason for the dismissal was to spare the complaining witness further trauma

and that the dismissal was not due to a "'lack of probable cause' or any 'doubt about the culpability about the accused[.]'" *Id.* at 1241-42 (quoting § 12-19-18(b)(5)). Significantly, we also observed that the trial justice determined that the prosecutor "credibly affirmed those statements as contained in the Rule 48(a) dismissal" and that "[t]here [was] no indication in the record that this is a case that failed to proceed because of lack of probable cause." *Id*. at 1242.

In the case at bar, there was a full, lengthy probation-violation hearing, and subsequently a three-day hearing on the motion-to-terminate, during which defendant's culpability in horrific acts of sexual abuse was established to the satisfaction of two seasoned trial justices. The prosecutor testified that the Rule 48(a) notice of dismissal was motivated by a desire to spare Natalie from additional trauma associated with recounting the childhood sexual abuse perpetrated upon her by defendant, as well as the state's satisfaction with the imposition of the twenty-five-year sentence. The record amply supports these considerations, all of which are embraced in the law.

For example, the first trial justice observed that Natalie "appeared to me to be suffering unreasonable and unnecessary emotional harm in giving this testimony," *Raso*, 80 A.3d at 35 n.6; the prosecutor expressed during the probation-violation hearing that he was hopeful that this would be the last time Natalie had to testify; and Natalie's biological father conveyed his emphatic desire

- 19 -

that his daughter not testify again.  The record is also undisputed that prior to the probation-violation hearing, the state offered a plea agreement that was significantly less than the twenty-five-year sentence imposed.  Having offered significantly less time to serve in a plea agreement, the state's assertion that it was satisfied with the twenty-five-year sentence is not surprising.

Finally, and importantly, consistent with the evidentiary hearing afforded the defendant in *Murray*, Raso was also provided an evidentiary hearing, during which he was permitted to test the prosecutor's grounds for the Rule 48(a) notice of dismissal.  This procedure satisfies fundamental due-process principles and the second trial justice "credibly found there's no issue and no doubt as to probable cause or the culpability of the defendant."  We accord this credibility determination great weight, *see Murray*, 216 A.3d at 1240; and having carefully reviewed the record, we are satisfied that "[t]here is no indication in the record that this is a case that failed to proceed because of lack of probable cause," *id.* at 1242, or "doubt about the culpability of the accused," § 12-19-18(b)(5).

## Conclusion

For the reasons stated, the order of the Superior Court is affirmed.  The papers in this case are remanded to the Superior Court.

**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Robert L. Raso. |
| **Case Number** | 2022-196-C.A. (P1/90-248A)<br>2022-197-C.A. (P1/90-247A)<br>2022-198-C.A. (P1/90-246A)<br>2022-199-C.A. (P1/90-250A)<br>2022-208-C.A. (P1/89-1667A)<br>2022-209-C.A. (P1/89-941A)<br>2022-210-C.A. (P1/87-2828A)<br>2022-211-C.A.  (P1/87-482A) |
| **Date Opinion Filed** | June 12, 2025 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice William E. Carnes, Jr. |
| **Attorney(s) on Appeal** | For State:<br><br>Lindsay Grizzard<br>Department of Attorney General<br><br>For Defendant:<br><br>Carl J. Ricci, Esq. |