**Supreme Court**

No. 2013-58-C.A.

(P1/04-1877A)

State                          :

v.                       :

Justin Prout.            :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                         :

v.                         :

Justin Prout.               :

Present: Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** The defendant, Justin Prout, appeals from a judgment declaring him to be in violation of the terms of his probation and sentencing him to serve thirteen years of a previously imposed suspended sentence. This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

## Facts and Procedural History

On February 10, 2006, a Superior Court jury found defendant guilty of breaking and entering, assault with a dangerous weapon, and simple assault.[1] On April 28, 2006, defendant was sentenced to ten years to serve on count 1 for breaking and entering; two years to serve and thirteen years suspended, with probation, on count 2 for felony assault, to run concurrently with the sentence for count 1; and one year to serve on count 3 for simple assault, to run concurrently

---

[1] These convictions were affirmed on appeal. <u>State v. Prout</u>, 996 A.2d 641, 643 (R.I. 2010).

with the sentences for counts 1 and 2.  On June 19, 2012, while defendant was incarcerated at the High Security Center of the Adult Correctional Institutions (ACI), in an area known as the "E Module," an altercation occurred between defendant and a correctional officer, Christian Torres, which resulted in significant injuries to Officer Torres.  As a result of this altercation, the state initiated probation-violation proceedings seeking to invoke the suspended portion of defendant's sentence for felony assault.  A hearing was conducted in the Superior Court on February 20 and 21, 2013.  The following facts are adduced from the testimonies of three correctional officers as well as from the testimony of defendant, whose recollection of the altercation that occurred on June 19, 2012 differs significantly from the version put forth by the officers.

The first witness to testify at the hearing was Adam Klaus, a correctional officer who observed the altercation involving defendant on June 19, 2012.  On that day Officer Klaus had been assigned to the control center of the E Module unit.  This unit contains twelve single-occupancy cells; defendant was being housed at that time in cell number eleven.  Officer Klaus testified that, from his post at the control center, he could see all twelve cells, as well as the shower area and the inmates' cosmetics lockers.  Officer Klaus explained that, when inmates in the E Module are retrieved from their cells, they normally are handcuffed with their hands behind their backs; in certain circumstances, however, such as when they are being taken to the showers, the inmates are handcuffed with their hands in front of their bodies.  According to Officer Klaus, inmates are handcuffed in the front when taken to the showers because they may need to use their hands to retrieve items from their cosmetics lockers.

Officer Klaus testified that, each morning in the E Module, inmates are fed breakfast in their cells at 7:05 a.m. and then they are taken either for recreation time or to the showers,

depending on the day. On June 19, 2012, the inmates were scheduled to take showers. From his position in the control center that morning, Officer Klaus saw Officer Torres approach defendant's cell to take him to the shower. Officer Klaus observed Officer Torres open a "trap" in the cell door; the trap is a small hole used for passing food and for accessing the inmate's hands to be cuffed before opening the door. According to Officer Klaus, Officer Torres cuffed defendant's hands together in front of his body, through the trap in the cell door. Officer Torres then signaled to Officer Klaus, who controlled the doors in the unit from his post in the control center, to open the door to defendant's cell. Officer Klaus opened the door, and then he observed that defendant asked Officer Torres if he could retrieve something from his cosmetics locker.[2] Officer Klaus then witnessed Officer Torres bend down to unlock defendant's locker, at which time defendant raised his cuffed hands above his head "and struck Officer Torres in the back of the head, knocking him to the ground." Officer Klaus further testified that defendant "kept kicking, punching. He put his hands around [Officer Torres's] neck, tried to choke him."

When Officer Klaus saw defendant strike Officer Torres in the back of the head, he radioed a "Code Blue," which is the code used when there is a fight and an officer needs assistance. It took approximately twelve to fifteen seconds for additional officers to arrive, during which time Officer Klaus saw defendant "striking Officer Torres in the head, in the face, kicking him, trying to choke him." Three officers initially responded and tackled defendant, who was on top of Officer Torres. Ultimately, eight officers, as well as a lieutenant and a captain, responded to the scene and were able to gain control of defendant. The defendant was then taken

---

[2] During direct examination, Officer Klaus testified that defendant had "asked Officer Torres if he could retrieve cosmetics from his cosmetics locker * * *." On cross-examination, however, Officer Klaus explained that he did not actually hear defendant make this request; from his position inside the control center, Officer Klaus saw defendant point to the locker, "saw [defendant's] mouth move" and "could hear mumbling," but was not able to "catch every word."

to the "dispensary" to be evaluated by medical staff. Other officers helped Officer Torres up from the floor, escorted him to the bathroom in the control center, and then took him to the dispensary as well.

The second witness to testify at the hearing was Edward Sousa, a correctional officer who responded to Officer Klaus's radio call for assistance on the morning of June 19, 2012. Upon arriving at the E Module, Officer Sousa witnessed defendant "being wrestled away from Officer Torres." Officer Sousa explained that Officer Torres was lying "limp" on the ground, apparently unconscious, and that defendant "had a grasp" of Officer Torres's pants. Officer Sousa corroborated Officer Klaus's testimony that defendant's hands were cuffed in front of his body during the fight, and he further testified that he did not see defendant handcuffed in the back at any point during that day.

After responding to the radio call for assistance, Officer Sousa helped gain control of defendant and then escorted him to the dispensary. Although Officer Sousa was not sure whether defendant had been injured, he recalled that "[i]t looked like he had some blood on his lips." Upon arriving at the dispensary, a nurse asked defendant what had brought him to the dispensary. Officer Sousa testified that "[t]he first half of [defendant's response] was inaudible and the second part of it was out of line so I grabbed him and slammed him." Officer Sousa identified a photograph of defendant, taken while he was at the dispensary, which showed his hands cuffed in front of his body. Officer Sousa also testified that, although the general policy of the Rhode Island Department of Corrections (RIDOC) is for inmates to be handcuffed in the back, there are certain circumstances in which, for practical reasons, inmates are cuffed in the front.

After defendant was evaluated by the nurse, he was placed in a cell in the rear of the medical area. Officer Sousa returned to the E Module, where he helped take Officer Torres to the bathroom and then to the dispensary. Officer Torres was briefly evaluated by a nurse at the dispensary, and then, pursuant to the orders of the shift supervisor, Officer Sousa took Officer Torres to the Garden City Treatment Center for further medical care.

Officer Torres was the third correctional officer to testify at the hearing. He testified that he was assigned to the E Module on June 19, 2012; however, his memory of that day was extremely limited. He recalled being present at roll call at the beginning of his shift, and then he had a vague memory of being taken to the treatment center. He had no recollection of the altercation with defendant. Officer Torres testified that, as a result of this altercation, he was treated for a concussion, a back injury, and a knee injury. At the time of the hearing, he was still being treated for the knee injury; and, as a result, he had not been back to work at the High Security Center since the date of the incident. Officer Sousa, who had worked with Officer Torres for approximately ten years, testified that Officer Torres was a "nonchalant officer" who "[went] by the book" and did not have an aggressive demeanor.

Three exhibits introduced at the hearing provided RIDOC's policies regarding the handcuffing of inmates behind, rather than in front of, their bodies. First, a "Policy and Procedure" document was introduced into evidence, which provided "procedures for controlling and supervising inmates who are classified to 'C' category."[3] Under a subheading titled "Handcuffs," this document provided: "'C' category inmates are cuffed behind their backs, palms facing out prior to their cell doors' being opened." Next, another "Policy and Procedure"

---

[3] According to Officer Klaus, defendant was classified at the time of the altercation as a "C" category inmate, which was "the lowest grade an inmate can have" and meant that he had to be handcuffed whenever he was outside of his cell.

document was introduced into evidence, which set forth "specific guidelines for the use of restraining devices by Rhode Island Department of Corrections (RIDOC) employees." This document provided, under a heading titled "Handcuffs": "Whenever possible, inmates / offenders should be cuffed in back." Finally, a "High Security Center Inmate Handbook" provided: "All segregation unit inmates will be cuffed behind their back prior to the opening of cell door. When departing the segregation unit inmates will be cuffed behind their back, shackled and escorted by a minimum of one officer. No exception other than a documented medical order."

Despite these guidelines suggesting that inmates should generally be handcuffed in the back, Officer Klaus testified that it was standard operating procedure for inmates to be handcuffed in the front when they were being taken to the showers. He explained that inmates were handcuffed in front so that they could use their hands to retrieve their cosmetics and towels, which they were not permitted to keep inside their cells. Officer Klaus explained that the guidelines were not absolute and required correctional officers to "use a little common sense." When asked whether officers would ever switch the handcuffs from back to front outside a secure cell, Officer Klaus explained that this was not done, because it would make the officer vulnerable to attack by the uncuffed inmate.

Officer Torres also testified that, in his twelve years as a correctional officer, he had brought inmates to showers "[t]housands of times," and he had always handcuffed the inmates in the front. Regarding the policy documents introduced into evidence, Officer Torres explained that "[t]here's [sic] some occasions where [inmates] should be cuffed in the back and there's [sic] other occasions where you cuff them in the front."

The defendant also testified at the hearing, and he provided a significantly different version of the events that occurred on the morning of June 19, 2012. He testified that, at approximately 7:30 a.m., Officer Torres approached his cell to take him to the shower. According to defendant, Officer Torres cuffed his hands behind his body, through the trap in the cell door. Contrary to the officers' testimonies, defendant asserted that it was normal for him to be cuffed in the back when taken to the shower. The defendant testified that, within seconds after his cell door opened, Officer Torres "jumped" on him. This action was preceded by defendant asking Officer Torres a question about toilet paper. The defendant explained that he had a documented medical problem and that, as a result, Officer Klaus had authorized him to receive three rolls of toilet paper per week instead of the usual two rolls allotted to each inmate. The defendant testified that, after Officer Torres took him from his cell on the morning of June 19, 2012, defendant told Officer Torres that he needed toilet paper. Officer Torres responded that he was not going to give it to him, and that defendant was only going to get two rolls per week.

Then, according to defendant, Officer Torres attacked him. The defendant testified that, after Officer Torres initially "jumped" on him, defendant stumbled but did not fall, and then Officer Torres "charged," causing him to fall. According to defendant, when the other officers came to the scene, he was on the ground, face down, and Officer Torres was on top of him. The defendant testified that, when the other officers arrived, Officer Torres was "putting pressure on [his] arms," and that the other officers then began to strike him. When asked where the officers struck him, defendant responded: "My face, my fingers, they was [sic] breaking my fingers, punching me in the face a couple of times. They was [sic] putting pressure, pulling my hair out." The defendant stated that he did not assault, strike, or choke Officer Torres.

Two photographs of defendant, taken at the dispensary after the altercation, show that he was bleeding from the mouth. A third photograph shows defendant's hands cuffed in front of his body; according to defendant, his handcuffs were switched from back to front on the way to the dispensary. The defendant also stated that he was treated for a broken finger. The defendant further testified that, a few days after the altercation with Officer Torres, while he was being held in a cell in the medical area, he had a conversation with another inmate about the handcuffing policy. According to defendant, this is when he learned that it would be against policy to be handcuffed with his hands in front of his body.

The defendant also provided testimony regarding a previous dispute that he had had with Officers Torres and Klaus concerning magazines. This incident had occurred in 2011, and it had related to the number of magazines that defendant was permitted to possess at one time. The defendant ultimately filed a grievance, in which he named Officer Torres and requested that he be reimbursed for certain magazines that had been destroyed. The defendant further testified that, during his time in the High Security Center, he had filed multiple grievances, had written letters to the Director of the RIDOC, and had sent letters to news organizations complaining of abuse.

The hearing justice issued a bench decision on February 21, 2013, in which he reviewed the credibility of the various witnesses and made factual findings regarding the altercation that occurred on June 19, 2012. Ultimately, the hearing justice found that defendant "was the aggressor in this case," and that he had violated the terms of his probation by engaging in conduct "that amounted to a breach of the peace and the failure to remain of good behavior." As a result, the hearing justice ordered defendant to serve the entirety of his thirteen-year suspended

sentence. Judgment was entered on March 11, 2013, and defendant filed a timely notice of appeal.[4]

## II

### Standard of Review

"At a probation-violation hearing, [t]he sole issue for a hearing justice * * * is whether or not the defendant has breached a condition of his or her probation by failing to keep the peace or remain on good behavior." State v. Barrientos, 88 A.3d 1130, 1133 (R.I. 2014) (quoting State v. Ford, 56 A.3d 463, 468 (R.I. 2012)). "Because probation-violation hearings are not part of a criminal prosecution, 'the burden of proof at a probation-violation hearing is much lower than the standard of beyond a reasonable doubt used in criminal trials.'" State v. Raso, 80 A.3d 33, 42 (R.I. 2013) (quoting Ford, 56 A.3d at 468). "[T]he state need only show that reasonably satisfactory evidence supports a finding that the defendant has violated his or her probation." Barrientos, 88 A.3d at 1133 (quoting Ford, 56 A.3d at 468-69). In making this determination, "the hearing justice weighs the evidence and assesses the credibility of the witnesses." Id. (quoting Ford, 56 A.3d at 469).

On review, "[t]his Court accords 'great deference' to the hearing justice's credibility assessments." Raso, 80 A.3d at 42 (quoting Ford, 56 A.3d at 469). It is well established that "this Court 'will not second-guess supportable credibility assessments of a hearing justice in a probation-revocation hearing.'" Id. (quoting Ford, 56 A.3d at 469). Rather, "our review is

---

[4] Although defendant's notice of appeal was dated February 22, 2013, final judgment did not enter until March 11, 2013. However, as this Court has previously stated, we will "overlook[] the premature filing of a notice of appeal." State v. Wray, 101 A.3d 884, 886 n.7 (R.I. 2014) (quoting State v. Rodriguez, 917 A.2d 409, 413 n.6 (R.I. 2007)).

'limited to considering whether the hearing justice acted arbitrarily or capriciously in finding a violation.'" Id. (quoting Ford, 56 A.3d at 469).

### III

### Discussion

On appeal, defendant argues that the hearing justice acted arbitrarily and capriciously by finding a violation on the basis of the evidence presented by the state. The defendant maintains that the hearing justice arbitrarily disregarded his testimony and the evidence that he had sustained serious injuries on June 19, 2012, and also overlooked the significance of the RIDOC's handcuffing policies. According to defendant, the officers' acknowledged violation of the handcuffing policies undermined their credibility because it was "simply not believable" that they, as "officers entrusted with maintaining safety and order in the ACI's High Security Center," would disregard or be ignorant of a "clearly written standard procedure." The defendant also contends that the record does not support the hearing justice's determination that defendant's testimony was not as candid as that of the officers. The state, for its part, argues that the hearing justice was entitled to make credibility determinations and that he did not err in accepting the officers' version of the events over the version presented by defendant.

We have often stated that "the standard employed in probation-violation hearings is considerably lower than that which applies in criminal prosecutions; 'the state need only show that reasonably satisfactory evidence supports a finding that the defendant has violated his or her probation.'" Raso, 80 A.3d at 42-43 (quoting Ford, 56 A.3d at 468-69). Here, the hearing justice issued a thorough, well-reasoned bench decision, in which he explained that the determination of this case hinged on the credibility of the officers versus that of defendant. The witnesses presented two competing versions of the events that transpired on June 19, 2012; according to

- 10 -

the officers, defendant was the first aggressor and was handcuffed with his hands in front of his body, while defendant maintained that he was handcuffed in the back and that he was attacked by Officer Torres. After summarizing the testimonies of Officers Klaus, Sousa, and Torres, as well as the testimony of defendant, the hearing justice found that defendant had been handcuffed with his hands in front of his body, and that he had been the aggressor in the altercation with Officer Torres. Thus, the hearing justice made a credibility determination that the correctional officers' view of the events was more plausible than defendant's version.

Regarding the RIDOC's handcuffing policy, the hearing justice found that the applicable policy documents provided that inmates were supposed to be handcuffed in the back; he also noted, however, that while most complex organizations have policies, these particular guidelines were not rules or regulations, and "deviation from policy may not even be actionable." He noted that the correctional officers had acknowledged the existence of the handcuffing policy but had "indicated it's just a policy and sometimes they do things differently because of common sense consideration." The hearing justice also accepted Officer Klaus's rationale as to the reason why inmates are handcuffed in the front when taken to the shower, as well as the reason why a correctional officer would not switch the cuffs from back to front after the inmate had exited his cell. The hearing justice further noted that Officers Sousa and Torres had independently corroborated Officer Klaus's testimony regarding the procedures for handcuffing inmates.

In contrast, the hearing justice found that defendant had not provided satisfactory answers to the questions that had been asked of him during the hearing and, specifically, that his answers regarding the magazine incident and his knowledge of the handcuffing policy had been

somewhat vague and confusing.[5]  The hearing justice credited defendant's testimony that he had spoken to another inmate about the handcuffing policy, but he noted that defendant had difficulty answering more specific questions about this interaction.  Ultimately, the hearing justice found:

> "[T]he [c]ourt accepts the correctional officer[s'] testimony as the most plausible story.  They've presented testimony that makes the most sense to this [c]ourt and is the most likely to be true in light of all the facts that have occurred, some of which are uncontested, but the most meaningful ones are the ones that have to do with the handcuffs.  And I make a finding that [defendant] was handcuffed in the front on that particular day, and I decline to accept [defendant's] version of the story because I don't believe that his answers and his responses to the [c]ourt's questions were as candid as the other officers."

Thus, the record reveals that the hearing justice thoroughly assessed the testimonial and documentary evidence presented at the hearing, and he issued a bench decision explaining why he was reasonably satisfied that the defendant had failed to keep the peace and remain in good behavior. See Raso, 80 A.3d at 44.  As this Court has often stated, "we will not 'second-guess supportable credibility assessments of a hearing justice in a probation-revocation hearing * * * .'" Id. (quoting Ford, 56 A.3d at 469).  After observing the witnesses' words, demeanors, and actions during the hearing—firsthand from his position at the bench—the hearing justice in this case found that the officers presented a more credible version of the events that unfolded on June 19, 2012.  We see no reason to question his findings in this regard.  Accordingly, we are convinced that the hearing justice acted neither arbitrarily nor capriciously, and we affirm his adjudication of probation violation.

---

[5] The hearing justice had initiated a direct line of questioning of defendant, after defendant had been questioned by defense counsel and by counsel for the state.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

The record of this case shall be returned to the Superior Court.

Justice Indeglia did not participate.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**          State v. Justin Prout.

**CASE NO:**          No. 2013-58-C.A.
                                 (P1/04-1877A)

**COURT:**          Supreme Court

**DATE OPINION FILED:**          June 5, 2015

**JUSTICES:**          Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

**WRITTEN BY:**          Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**          Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                                 Associate Justice William E. Carnes, Jr.

**ATTORNEYS ON APPEAL:**

                                 For State:  Aaron L. Weisman
                                            Department of Attorney General

                                 For Defendant:  Kara J. Maguire
                                            Office of the Public Defender