**Supreme Court**

No. 2012-325-C.A.

(P2/09-51A)

State                             :

v.                               :

Robert Beaudoin.          :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                        :

v.                                        :

Robert Beaudoin.                              :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.**  The defendant, Robert Beaudoin, seeks review of a judgment finding him to be in violation of the terms of his probation and sentencing him to serve two years of a previously imposed suspended sentence.  On appeal, the defendant argues that the hearing justice acted arbitrarily and capriciously in finding that he violated the terms of his probation.  This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After considering the parties' written submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.[1]

---

[1] Although we affirm the judgment adjudging defendant to have violated the conditions of his probation, we are mindful that in a companion case we have quashed the sentence of imprisonment imposed as a result of the violation.  Following the violation hearing, defendant was tried before a jury on the two charges underlying the violation: second-degree sexual assault and larceny (amended from second-degree robbery).  After the jury found him not guilty of both counts, he filed a motion to terminate imprisonment under the provisions of G.L. 1956 § 12-19-18. See State v. Beaudoin, No. 2013-254-C.A. (R.I., filed April 26, 2016).

# I

## Facts and Procedural History

The defendant pled nolo contendere in June 2009 to one count of felony assault. He was sentenced to fifteen years with five months to serve at the Adult Correctional Institutions and the balance suspended with probation. On May 14, 2012, the state filed a notice of probation violation pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure, alleging that defendant had failed to comply with a specific condition of his probation by "fail[ing] to keep the peace and be of good behavior." The violation report also stated that "[s]aid violation of probation is not contingent upon any specific criminal offense." Nevertheless, the report referred to various attached documents from the Woonsocket Police Department containing allegations of second-degree sexual assault and second-degree robbery. A three-day violation hearing was held in Superior Court in July 2012, during which eight witnesses testified about certain events occurring on or about May 9, 2012. As the issues raised by defendant on appeal concern the factual findings and credibility assessments of the hearing justice, we set forth the testimony of the various witnesses in some detail.

The complaining witness, Matthew—who was twenty-three years old at the time of the hearing—testified that he had suffered a traumatic brain injury when he was twelve years old that left him disabled. He stated that, as a result of his injury, he has problems with short-term memory and he goes to the Resource for Human Development (RHD) for treatment. However, Matthew described his long-term memory as "excellent." He added that he takes "Depakote" and "Abilify" to "stabilize [his] mood, and * * * stabilize all the functions up in [his] head, making sure everything is in an equilibrium balance."

Matthew testified that on May 9, 2012, he rode his bicycle to his then girlfriend, Hiedi Caron's, apartment in Woonsocket. He testified that normally he stored his bicycle in Caron's third-floor apartment, but when he arrived on May 9, defendant, a friend of Caron's family, offered to help him bring his bicycle to defendant's second-floor apartment. After helping Matthew store his bicycle in the apartment, Matthew testified, defendant asked him "if he could show [him] something."

Matthew testified that he then followed defendant into the bedroom of defendant's second-floor apartment because he knew and trusted defendant. Matthew stated that he heard the door "click" and realized that defendant had locked it. In the bedroom, defendant showed Matthew a "scorpion sword," which Matthew described as "about two-and-a-half feet long" with a "beautiful handle on it." Matthew testified that defendant also showed him a "22 caliber hand gun" and a "[n]ine-and-a-half inch[] long, ten inch[] long" dagger. Matthew stated that defendant approached his right side and defendant's "hand then went into [Matthew's] pants." Matthew explained that he was wearing "loose-fitted shorts for biking" and that defendant "grabbed [his] scrotum very tightly and said, '[n]ice eyes.' And then after that [defendant] asked [Matthew] if [he] had $50." Matthew added that he was in "excruciating pain." Matthew further testified that when defendant asked for $50, "[i]t was more of a demand for it." He described: "It was, like, he said, 'I know you have $50. Give it to me or else,' because he had a gun and one sword and dagger in his room." Matthew gave defendant a $50 bill and then left the apartment to go upstairs to see Caron.

Matthew testified that he had not told Caron about the incident while he was at her house. However, after Matthew returned home that night, he spoke with Caron on the phone and, at that point, he told Caron what had happened. Matthew explained that he had not reported this

incident to his parents because they were both in the hospital on that day. Matthew stated that, the following day, he disclosed the incident to a staff member at the RHD, and then reported it to the Woonsocket Police Department.[2]

Subsequently, at the hearing, the state presented Det. Jamie Paone of the Woonsocket Police Department, who assisted with interviewing defendant. Detective Paone testified that defendant told her that he had sold a sword to Matthew and that Matthew's parents were upset over the sale and wanted the money returned to Matthew. Detective Paone further stated that, during the interrogation, defendant denied owning a gun or a dagger and denied touching Matthew.

Matthew's mother, Doree, also testified at the hearing. She explained that, on May 9, 2012, she had been admitted to the hospital for a week because of a fever. She learned about the incident involving her son and defendant several days later, when her son and daughter went to visit her at the hospital. Doree added that she never discussed the sale of a sword or any kind of weapon with her son that day and "never" had a conversation with Caron's mother about the sale of a sword. Furthermore, she testified that, although she had given Matthew greater financial independence, she has also "monitored" his bank account "on and off."

On cross-examination, Doree confirmed that her son took "Abilify," "Depakote," "blood pressure medicine[,] and multivitamins." She also stated that RHD has worked well to rehabilitate Matthew's memory and that his ability to observe, recollect, and recount went from a "six," on a scale of one to ten, to now a "ten" on "some days." Doree added that Matthew "can recollect every event."

---

[2] Although Matthew testified that he had reported the incident to the Burrillville Police Department, the police report was clearly prepared by the Woonsocket Police Department.

- 4 -

The defense presented Pauline Glaude, defendant's mother-in-law. Glaude testified that she lived with defendant and her daughter. She stated that she met Matthew on May 9, 2012, when she saw him go into defendant's bedroom and close the door. Glaude, however, acknowledged that she did not hear or see anything that had happened in the bedroom. Glaude testified that she had seen a sword on the bedroom wall, but had never seen any guns or daggers in defendant's bedroom. Nancy Beaudoin, defendant's wife, also testified that she had not known defendant to own a gun or dagger. However, she acknowledged that defendant had a sword, and she confirmed that she wanted him to get rid of it.

Officer Gregory Klocek of the Woonsocket Police Department testified that he interviewed Matthew on May 10 and typed Matthew's witness statement. Relying on the statement that he prepared on that same day, Officer Klocek confirmed that Matthew had reported that defendant showed him weapons, including brass knuckles, and that Matthew said defendant had "felt [his] penis and testicles."

Caron also testified at the hearing and stated that she was no longer dating Matthew. She then recounted the night of May 9, 2012. Caron testified that, after Matthew left her apartment, she "skyped" with him from about 11:30 p.m. to 1:30 a.m. When she asked Matthew why he looked upset, she recalled that Matthew told her that he had fought with "either both of his parents or one of his parents about money" because he had loaned defendant $50. She added that Matthew then confided in her that defendant had "groped" him, explaining that defendant "had cupped him outside his pants and gripped him a little bit." Caron testified that she told Matthew to report the incident to his parents or the police and that Matthew asked her to talk to her mother. Caron said that she agreed to see if she could get Matthew's money returned, but she testified that "it wasn't [her] place to tell her [mother] what happened between them."

The defendant was the final witness to testify at the hearing. He stated that he lived with his wife and mother-in-law, and then proceeded to describe the events of May 9, 2012. The defendant testified that he had met Matthew "about three times" through Caron, and he was checking the mail on May 9 when he recognized Matthew arrive on his bicycle. The defendant helped Matthew with his bicycle and asked Matthew if he knew anyone who wanted to buy a sword "like in Scorpion King * * * the movie." The defendant stated that Matthew was excited about the sword and wanted to see it. The defendant testified that Matthew gave him $20 for the sword, but left the sword in the bedroom because defendant had not wanted Matthew to take it home on his bicycle. The following day, defendant went upstairs to see Caron's mother and learned that Matthew's parents were upset that Matthew "lent" defendant money. The defendant recalled that Caron's mother complained that she had been dealing with Matthew's parents until 1:30 a.m. The defendant testified that he had "assume[d]" Matthew's parents were upset about the sale of the sword.

The defendant testified that on May 11, 2012—two days after the incident—detectives went to his house and asked him to go to the police station because they were following up on a complaint. The defendant testified that he had not known why he was brought to the police station, and he denied owning a gun, knives, or daggers. At the hearing, defendant acknowledged that he was on probation for assault with a dangerous weapon, and he emphatically denied touching Matthew.

After the close of the hearing, the hearing justice issued a bench decision stating that he is "obliged to look at the evidence to see whether * * * [he is] reasonably satisfied that the defendant did not keep the peace and/or was not of good behavior in order to find him and adjudge him to be a violator of the terms and conditions of a suspended probationary sentence."

- 6 -

The hearing justice continued to explain that he was "not obliged to decide whether * * * [defendant] put his hands underneath the clothing of [Matthew] and groped his genitals." The hearing justice described Matthew as "limited" because of the head injury he suffered at a young age, and consequently, found "a child-like innocence to [him]," and "a genuine flavor to his statements." The hearing justice specified that Matthew's statements were "without guile or pretense." He acknowledged that there were "inconsistencies with respect to what [Matthew] testified to at [the hearing] and what he said on earlier occasions," but that "given [Matthew's] limited mental circumstances, [the hearing justice] [found] that these inconsistencies [were] explainable and normal." The hearing justice found it was "plain" that defendant recognized Matthew "was an easy target," and he found defendant's explanation for taking Matthew into his bedroom—to sell him a sword—"nonsensical." The hearing justice stated that he did not know what went on in the apartment, but added "[w]hatever went on there wasn't good." The hearing justice concluded that he was "convinced, if nothing else, [defendant] took [Matthew's] money. Whether he groped [Matthew] under his clothes, over his clothes, [he] wouldn't be surprised if that did happen; but [he was] convinced [defendant] took [Matthew's] money."

Ultimately, the hearing justice found "absolutely no persuasive reason why [Matthew] would invent an entire parable" or "knowingly and purposefully lie" to cause defendant "to be adjudged a violator." He further found that defendant had not kept the peace or been of good behavior, thus violating the conditions of his probation. As a result, the hearing justice ordered defendant to serve two years of his suspended sentence, with the balance suspended with

probation. Judgment was entered on September 4, 2012, and defendant filed a timely notice of appeal.[3]

## II

### Standard of Review

"At a probation-violation hearing, [t]he sole issue for a hearing justice * * * is whether or not the defendant has breached a condition of his or her probation by failing to keep the peace or remain on good behavior." State v. Prout, 116 A.3d 196, 202 (R.I. 2015) (quoting State v. Barrientos, 88 A.3d 1130, 1133 (R.I. 2014)). "Because probation-violation hearings are not part of a criminal prosecution, the burden of proof at a probation-violation hearing is much lower than the standard of beyond a reasonable doubt used in criminal trials." Id. (quoting State v. Raso, 80 A.3d 33, 42 (R.I. 2013)). "[T]he state need only show that reasonably satisfactory evidence supports a finding that the defendant has violated his or her probation." Id. (quoting Barrientos, 88 A.3d at 1133). "To determine whether the defendant has committed a violation, the hearing justice weighs the evidence and assesses the credibility of the witnesses." Barrientos, 88 A.3d at 1133 (quoting State v. Ford, 56 A.3d 463, 469 (R.I. 2012)).

It is well established that "[o]n review, '[t]his Court accords great deference to the hearing justice's credibility assessments'" and "will not second-guess supportable credibility assessments of a hearing justice in a probation-revocation hearing." Prout, 116 A.3d at 202 (quoting Raso, 80 A.3d at 42). "Rather, 'our review is limited to considering whether the

---

[3] Although defendant's notice of appeal was filed on July 25, 2012, final judgment did not enter until September 4, 2012. This Court has repeatedly held that "we will 'overlook[] the premature filing of a notice of appeal.'" State v. Prout, 116 A.3d 196, 202 n. 4 (R.I. 2015) (quoting State v. Wray, 101 A.3d 884, 886 n. 7 (R.I. 2014)).

- 8 -

hearing justice acted arbitrarily or capriciously in finding a violation.'" Id. (quoting Raso, 80 A.3d at 42).

**Discussion**

On appeal, defendant argues that the hearing justice "clearly erred" in finding that defendant violated the conditions of his probation on the basis of the evidence presented by the state. The defendant maintains that the hearing justice's findings of fact were arbitrary and capricious because "they were unsupported by the facts adduced at the hearing." Specifically, defendant asserts that the hearing justice's finding that the inconsistencies in Matthew's hearing testimony and prehearing statements are explainable by his injury, contradicts testimony presented by Matthew at the hearing. Additionally, defendant argues that the hearing justice's finding that defendant took Matthew's money is contrary to the evidence. Furthermore, defendant alleges that the hearing justice's conclusion that "[w]hatever went on there wasn't good" is insufficient to support a finding of a probation violation.

We have frequently expressed that "the standard employed in probation-violation hearings is considerably lower than that which applies in criminal prosecutions; the state need only show that reasonably satisfactory evidence supports a finding that the defendant has violated his or her probation." Prout, 116 A.3d at 203 (quoting Raso, 80 A.3d at 42-43). In other words, the hearing justice need only be reasonably satisfied "that an alleged violator has failed to keep the peace or be of good behavior." Barrientos, 88 A.3d at 1134.

In this case, the hearing justice recognized Matthew's injury and the rehabilitative measures he had taken, but the hearing justice stated that "it [was] clear to any casual observer who would have walked into th[e] courtroom and listened to no more than five minutes of his

testimony that this young man is limited." The hearing justice described Matthew as having a "child-like innocence" and being "rather simple," and he added that Matthew's statements were "without guile or pretense." The hearing justice acknowledged the "inconsistencies with respect to what [Matthew] testified to at [the hearing] and what he said on earlier occasions," but the hearing justice found the inconsistencies "explainable" given Matthew's injury.

Conversely, the hearing justice found defendant's testimony that he wanted to sell the sword to Matthew "nonsensical." Ultimately, the hearing justice stated that he did not know whether a sexual assault occurred, but he was "convinced" that defendant "took [Matthew's] money." The hearing justice was "persuaded * * * defendant did not keep the peace and was not of good behavior."

The defendant's arguments center on the hearing justice's credibility determinations. However, a review of the record reveals that the hearing justice thoroughly assessed the evidence presented before concluding that he was reasonably satisfied that the defendant had failed to keep the peace and remain of good behavior. See Prout, 116 A.3d at 204. We have repeatedly stated that "we will not second-guess supportable credibility assessments of a hearing justice in a probation-revocation hearing * * *." Id. (quoting Raso, 80 A.3d at 44). The hearing justice observed from his unique perspective on the bench the witnesses' words and their demeanors. Accordingly, we are convinced that the hearing justice acted neither arbitrarily nor capriciously.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of conviction in so far as it adjudges the defendant to have violated the conditions of his probation. The record of this case shall be returned to the Superior Court.


**TITLE OF CASE:**        State v. Robert Beaudoin.

**CASE NO:**        No. 2012-325-C.A.
                                (P2/09-51A)

**COURT:**        Supreme Court

**DATE OPINION FILED:**    April 26, 2016

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                                Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

                                For State:   Virginia M. McGinn
                                                Department of Attorney General

                                For Defendant:  Kara J. Maguire
                                                Office of the Public Defender